WINDOM, Presiding Judge.
Kevin Andre Towles appeals his capital-murder conviction and sentence of death. Towles was convicted of murder made capital for the intentional killing of Geontae Glass, who was under the age of 14. See § 13A-5-40(a)(15), Ala Code 1975. The jury unanimously recommended that the circuit court sentence Towles to death. The circuit court followed the jury's recommendation and sentenced Towles to death.
Towles was involved in a romantic relationship with Shalinda Glass. Shalinda had two children, Geontae Glass and Shaliyah Glass. The children considered Towles their father. Shalinda and her children sometimes spent the night at her apartment. They, however, often spent their nights with Towles at one of his two houses-one located on Broad Street in Albertville and the other located on Shady Grove Road in Boaz.
In December 2006, Geontae was a five-year-old boy in kindergarten at John S. Jones Elementary School in Etowah County. Kelly Page, Geontae's teacher, used a system to grade her students' conduct each day. Under her system, students who had behaved well received a smiling face, students who had received a warning or two for their behavior received a straight face, and students who had not behaved received a frowning face. On Friday, December 1, 2006, Page gave Geontae a straight face. Upon receiving the straight face, Geontae became upset, cried, and said that his "daddy [was] going to spank [him] when [he got] home." (R. 1898.)
On the Saturday after Geontae had brought home the straight face on his conduct report, the family went to a barbeque restaurant that Towles owned and operated. While at the restaurant, Towles and/or Shalinda punished Geontae by making him stand in the corner all day. That night, Towles, Shalinda, and the children left the restaurant and went to spend the night at Towles's Shady Grove residence.
The following morning, Shaliyah woke up and watched television in the den. While she was watching television, Shaliyah saw Towles lead Geontae through the den and outside of the house. Shaliyah heard Towles say that Geontae "had to pay." (R. 2216.) Later, Shaliyah saw Towles carry Geontae into the house, through the den, and toward some rooms on the other side of the house. Shaliyah never saw Geontae alive again.
After Towles left Geontae in one of the rooms on the other side of the house, he *1079 joined Shaliyah in the den. Shaliyah saw that Towles was crying. Shaliyah watched television for a while, and then asked Towles to let her ride a four-wheeler type, all-terrain vehicle. Towles agreed, and the two of them rode four-wheelers for the rest of the day. Both Towles and Shaliyah testified that Towles took Geontae food Sunday evening. At some point, Geontae died from injuries he had received by being struck on the buttocks with a board.
After Geontae died, Towles and Shalinda devised a plan in which they would put Geontae's body in Shalinda's car, drive to a gasoline station, and stage a car theft/kidnapping. Thereafter, between 2:30 and 3:00 a.m. on Monday, Towles called Bobby Spidell, an individual he had known most of his life, and asked Spidell to come pick him up. Spidell drove his blue pickup truck to Towles's Broad Street residence, where he met Towles and Shalinda between 4:30 and 5:00 a.m., and they talked in the driveway for a while. Thereafter, Towles got into Spidell's truck and told Spidell to drive him to a Conoco brand gasoline station on Baltimore Avenue in Albertville.
That morning Shaliyah got ready for school. When Shaliyah got in the car to go to school, Geontae's body was already in the backseat. Shalinda told Shaliyah that Geontae was asleep and to leave him alone. They then drove to the Conoco gasoline station on Baltimore Avenue. When they arrived at the gas station, Shalinda and Shaliyah left Geontae in the car and went inside the store. Once inside the store, Shaliyah tried to use the restroom, but it was out of order. She then went with her mother to the store clerk to purchase drinks and snacks.
While Shalinda and Shaliyah were in the store, Spidell's truck pulled into the parking lot of the gas station. A person matching Towles's description got out of the truck, got into Shalinda's car, and sped away, followed by the truck. Meanwhile, Shalinda paid for Shaliyah's snacks, and they went outside where they saw that the car was missing. Shalinda then went to a pay telephone and telephoned Towles. When Towles did not answer his telephone, Shalinda telephoned 911 emergency and reported her car stolen and Geontae missing.
After Shalinda reported Geontae missing, an AMBER Alert was issued for him, and City, County, and Federal law-enforcement officers became involved in investigating his whereabouts.[1] Shalinda, Shaliyah, and Towles were all interviewed by law-enforcement officers. During her interview, Shaliyah described the residence where she had been the preceding Sunday-the Shady Grove residence. In his interview, Towles omitted any information about the Shady Grove residence but gave law-enforcement officers permission to search his Broad Street residence. While searching the Broad Street residence, officers noticed that the residence did not match the description given to them by Shaliyah. The officers also found a power bill for the Shady Grove residence in the name of Towles's wife, Vicky Towles.
Thereafter, officers searched the Shady Grove residence and found Shalinda's car with Geontae's body in the trunk. They also found, among other things, illegal drugs, an assault rifle, a pistol, a bulletproof vest, and $33,382. After officers located Geontae's body, Investigator Mike Jones of the Etowah County Sheriff's Office and Agent Brenn Tallent of the Federal Bureau of Investigation interviewed Towles again. During the interview, *1080 Towles stated that he was responsible for what had happened to Geontae and that he did not want Shalinda charged in Geontae's death. Towles then told the officers that two or three masked men came to his Shady Grove residence to rob him and, during the robbery, caused Geontae's death.[2] Specifically, Towles told the officers that he was outside his Shady Grove residence on Sunday when masked men approached him and demanded that he bring Geontae to them. Towles complied with the masked men's demand. Once the men had Geontae, they demanded money. Towles said he gave the men approximately $15,000. Before the men left, one of them took Geontae behind the house and beat him while another masked man held Towles at gunpoint. After the beating, Towles took Geontae inside the residence. Towles said that he knew Geontae was injured and planned to take Geontae to the doctor the next morning. Geontae, however, died from his injuries.
Dr. Emily Ward, a state medical examiner, performed the autopsy on Geontae. Dr. Ward noted injuries all over Geontae's body that she considered to be nonlethal. Geontae had new injuries and old injuries that had begun to heal. Dr. Ward testified that Geontae's body had incisions to the right buttock and thigh and that there was a large accumulation of blood in the muscles in that area. Dr. Ward explained that the accumulation of blood was significant because it indicated that the injury was extremely forceful. Further, the muscular damage sustained by Geontae caused an increase in his bloodstream of myoglobin, which Dr. Ward classified as a highly toxic substance capable of causing kidney failure. Geontae's lower back did not appear to have injuries to the skin, indicating that Geontae did not receive a direct blow to that area. However, the force applied to the buttocks was significant enough to cause hemorrhaging that reached Geontae's spinal cord. Based on the level of hemorrhaging in the nerve fibers of the lower portion of the spinal cord, Dr. Ward surmised that Geontae's injuries resulted in paralyzation. Dr. Ward testified that in her opinion Geontae died of complications from blunt-force injuries but that he could have survived had he received medical attention. Dr. Ward further testified that a portion of the skin on Geontae's buttocks was denuded. Dr. Ward testified that the denuded-skin injury was consistent with having been struck with a piece of wood.
After the autopsy, officers went back to the Shady Grove residence to search for any items that could have caused the injuries that led to Geontae's death. In the backyard officers found a four-foot long, two-inch by four-inch piece of lumber with red/brown stains. The stains tested positive for blood. Subsequent testing established that the stains contained Geontae's DNA.
Standard of Review
Because Towles has been sentenced to death, this Court must search the record for "plain error." Rule 45A, Ala. R. App. P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala. 2008), the Alabama Supreme Court explained:
*1081 " ' "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." ' Ex parte Bryant, 951 So.2d 724, 727 (Ala. 2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala. Crim. App. 1998) ). In United States v. Young, 470 U.S. 1, 15 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
" 'The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," United States v. Frady, 456 U.S. 152, 163 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," United States v. Atkinson, 297 U.S. [157] , at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S., at 163, n.14.'
"See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala. 2003) (recognizing that plain error exists only if failure to recognize the error would 'seriously affect the fairness or integrity of the judicial proceedings,' and that the plain-error doctrine is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result' (internal quotation marks omitted) )."
11 So.3d at 938. "The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal." Hall v. State, 820 So.2d 113, 121 (Ala. Crim. App. 1999). Although Towles's failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala. Crim. App. 1991).
Discussion
On appeal, Towles argues, among other things, that the State used improper methods to undermine his defenses. Specifically, Towles argues that part of his defense was to assert that Shalinda had caused Geontae's death. Towles then asserts that the State rebutted that defense by improperly informing the jury that Shalinda had been convicted of and was serving a sentence in prison for failing to protect Geontae from Towles. According to Towles, the State used Shalinda's conviction to show that he had caused Geontae's death and, thus, undermined his defense that she was the actual killer. Towles asserts that Shalinda did not testify; therefore, her conviction was inadmissable. However, the circuit court failed to prevent or take corrective action when the State improperly informed the jury of Shalinda's conviction and sentence. Towles also argues that the circuit court improperly lessened the State's burden to prove the intent element of capital murder. Specifically, Towles asserts that the State incorrectly informed the jury that it could prove that Towles had the specific intent to kill Geontae by establishing that Towles reasonably knew that his actions would cause serious physical injury to Geontae. Towles then asserts that the circuit court compounded the prosecutor's error by instructing the jury that the knowledge that his actions would probably cause serious physical injury was sufficient to establish the intent necessary for a capital-murder conviction. Towles failed to properly and/or timely raise these issues at trial; therefore, this Court will review them for plain error only. Rule 45A, Ala. R. App. P.
*1082 I.
Towles argues that the circuit court failed to take corrective actions when the State improperly informed the jury that Shalinda had been convicted of and was in prison for failing to protect Geontae from Towles. According to Towles, the State used Shalinda's conviction to undermine his defense that Shalinda caused the injuries that led to Geontae's death. Towles asserts that, because Shalinda did not testify, evidence of her conviction was inadmissible, and the circuit court should have taken corrective action when the jury was informed of her conviction. This Court agrees.
The State's theory of the case was that Towles became angry with Geontae for receiving a straight face from his teacher at school. Thus, Towles punished Geontae all weekend. On Sunday, Towles forced Geontae outside the house and used a piece of lumber to strike Geontae on the buttocks. The injuries Geontae received during the beating went untreated and caused his death.
Towles's core defense was that Shalinda had caused Geontae's death. Towles sought to show that, after causing Geontae's death, Shalinda threatened to inform the police of Towles's illegal drug activity unless he helped her conceal her crime. Because he was being blackmailed, Towles helped Shalinda execute her plan to falsify a kidnapping and murder. Thus, Shalinda was responsible for Geontae's death.
To support Towles's defense, his attorney alleged during opening statements that Shalinda had killed Geontae. To rebut defense counsel's statement that Shalinda had killed Geontae, the prosecutor told the jury: "Ladies and gentlemen, a mother has a duty to protect her child. If she doesn't meet that duty, she has a price to pay. And Shalinda Glass is paying it. She's paying the price for not protecting her child from him, as she should." (R. 1236-37.) Later, Towles testified that he did not cause any injuries to Geontae. Rather, Shalinda caused Geontae's death. During cross-examination, the prosecutor sought to impeach Towles's testimony by showing that Shalinda had pleaded guilty to failing to protect Geontae from him. When Towles would not agree with the prosecutor, the prosecutor became argumentative and stated to the jury that "[t]hat's why [Shalinda is] in prison, because she admitted her part in not protecting that child from you." (R. 2643.) The circuit court failed to take corrective action to prevent the jury from considering Shalinda's conviction as proof of Towles's guilt.
This Court has explained:
"Generally, evidence and argument regarding the outcome of a codefendant's case are improper in the trial of a fellow accused. In Tomlin v. State, 591 So.2d 550, 554 (Ala. Crim. App. 1991), this Court stated:
" 'In 1899, the United States Supreme Court held that evidence of a codefendant's conviction was not admissible in the trial of his fellow accused. See Kirby v. United States, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890 (1899). This is still the prevailing view. See Annot., 48 A.L.R.2d 1016, and cases cited therein.
" ' "Where two or more persons are jointly indicted for the same criminal offense which is in its nature several, or are separately indicted for such offense or for separate offenses growing out of the same circumstances, and are tried separately, the fact that one defendant has pleaded guilty or has been convicted is, as a general rule, inadmissible as against the other, since competent and satisfactory evidence against one person charged with an offense is not necessarily so against another person charged with the same offense, and since each person *1083 charged with the commission of an offense must be tried upon evidence legally tending to show his guilt or innocence.'
" ' 48 A.L.R.2d at 1017.'
"However, we went on to note that '[t]here are exceptions' to this general rule, the first being ' "[w]here the common-law distinction between a principal and an abettor has not been abolished, the conviction or plea of guilty of a principal is admissible against one being tried separately as an abettor, since the principal's guilt is a prerequisite to prove the guilt of the accused." ' 591 So.2d at 554 (quoting 48 A.L.R.2d at 1017, n. 1 ). Additionally, 'evidence of a codefendant's conviction may be admissible for purposes of impeachment when the codefendant testifies at trial. However, the court should give the jury a limiting or cautionary instruction concerning the use of the conviction.' 591 So.2d at 554 (citing United States v. Austin, 786 F.2d 986 (10th Cir. 1986), and Stokes v. State, 462 So.2d 964 (Ala. Crim. App. 1984) ). In Tomlin, this Court held that because evidence that Tomlin's codefendant had already been convicted and sentenced to death came in through the testimony of a law-enforcement official, the codefendant did not testify, and the trial court's limiting instructions were inadequate, neither of the recognized exceptions applied. Accordingly, reversal of Tomlin's conviction and death sentence was mandated. 591 So.2d at 554-56."
Lewis v. State, 24 So.3d 480, 506 (Ala. Crim. App. 2006).
Towles argues-and the State concedes-that Shalinda's conviction and sentence were inadmissible and should not have been considered by the jury. The State, however, argues that the error in allowing the jury to consider Shalinda's conviction was harmless. To the contrary, under the circumstances of this case, the error in allowing the jury to consider Shalinda's conviction resulted in plain error and requires the reversal of Towles's conviction. Rule 45A, Ala. R. App. P.
As the State correctly explains in its brief, "[t]he pivotal question in this case was who administered the beating that killed Geontae." (State's brief, at 37.) To show that Towles "administered the beating," id., the State improperly informed the jury that Shalinda had been convicted of and was in prison for failing to protect Geontae from Towles. The State used Shalinda's conviction to show that she did not kill Geontae; rather, she failed to stop Towles from killing the child. The circuit court failed to take any action to prevent the jury from considering Shalinda's conviction as evidence of Towles's guilt. Thus, the circuit court allowed the jury to consider Shalinda's conviction to strike at the heart of Towles's defense.
Further, the evidence establishing that Towles caused Geontae's death was not so overwhelming as to render the error harmless. Instead, the State's most damning evidence against Towles was the testimony of Shalinda's juvenile daughter. There was, however, no direct evidence regarding when the injuries that caused Geontae's death were inflicted or who inflicted those injuries. Therefore, informing the jury that Shalinda was convicted of failing to protect Geontae from Towles allowed the jury to convict Towles based, in part, on Shalinda's conviction. Consequently, the circuit court's failure to prevent the jury from considering Shalinda's conviction had "an unfair prejudicial impact on the jury's deliberations," Ex parte Bryant, 951 So.2d 724, 727 (Ala. 2002) (citations and quotations omitted), and "adversely affected [Towles's] substantial right[s]." Ex parte Brown, 74 So.3d 1039, 1043 (Ala. 2011). As such, plain error resulted when the circuit court allowed the State to use *1084 Shalinda's conviction to undermine Towles's defense. See Rule 45A, Ala. R. App. P.
II.
Towles also argues that the circuit court improperly lessened the State's burden of proving the intent element of capital murder. Specifically, Towles asserts that the State incorrectly informed the jury that it could establish the intent element of capital murder by showing that Towles knew there was a reasonable likelihood that his actions would cause Geontae serious physical injury. Towles then argues that the circuit court gave legal significance to the prosecutor's error by instructing the jury that "knowledge of the probability of death or great bodily harm is sufficient to constitute murder." (R. 2869-70.) According to Towles, the circuit court's instruction lessened the State's burden and undermined his defense that the killing was, at most, unintentional. This Court agrees.
As discussed in Part I of this opinion, the crux of Towles's defense was to blame Shalinda for Geontae's death. He, however, also argued that the State had not, and could not, prove that anyone had intended to kill Geontae. Rather, Geontae's death was the accidental result of harsh punishment.
To rebut Towles's defense that the killing was unintentional, the State argued to the jury:
"Now, what is intent? What is intentional? Now, the judge is going to define that for you, too. And I think he's going to tell you that intent is one of those things that you can only determine by a person's conduct, the circumstances. And you can consider things. Like, if a man is over two hundred pounds and a child is like fifty-three pounds and the person is using a stick, all those are things that you can consider; the severity of the beating, the duration of the beating, the relative size of the victim and the defendant. All those are things that you can consider in deciding whether or not there's intent. Whether or not that person reasonably knew that he was either going to cause a death or-and listen for this-death or serious physical injury.
"If I do something to you and I know that it's a reasonable likelihood I'm either going to kill you or seriously injure you and you die, that's sufficient evidence of intent.
"So listen for that jury charge, please. That's very important. And that is a matter of Alabama law."
(R. 2804-06.) Later, in accordance with the prosecutor's argument, the circuit court instructed the jury that evidence that the defendant intended to cause great bodily harm was sufficient to establish murder. Specifically, the circuit court instructed the jury:
"I charge you, ladies and gentlemen of the jury, that intent is a state of mind and, therefore, rarely susceptible of direct or positive proof. Instead, the element of intent is usually inferred from the facts testified to by the witnesses, together with the circumstances as developed by the evidence.
"I charge you that the duration, brutality and relative strengths of the defendant and victim are factors to be considered by the jury as indication of the defendant's intent to kill.
"Moreover, the continued infliction of injuries by an adult on the child victim may be considered by you as evidence of a conscious intent to seriously harm the victim.
"I charge you, ladies and gentlemen of the jury, that the severity of a defendant's action may be sufficient proof of knowledge of the probability of death or great bodily harm sufficient to constitute murder.
*1085 "The intent to kill may be inferred by the vicious character of an assault."
(R. 2869-70.)
"It is well settled that '[t]he Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." ' " Townes v. State, 253 So.3d 447, 457 (Ala. Crim. App. 2015) (quoting Williams v. State, 710 So.2d 1276, 1334 (Ala. Crim. App. 1996), quoting in turn, In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ).
"Under § 13A-5-40(b), Ala. Code 1975, 'murder' as used in § 13A-5-40(a) ( [15] ), Ala. Code 1975, ... is defined in § 13A-6-2(a)(1), Ala. Code 1975. Section 13A-6-2(a)(1), Ala. Code 1975, provides: 'A person commits the crime of murder if he or she ...: [w]ith intent to cause the death of another person, ... causes the death of that person or of another person.'
" 'Alabama appellate courts have repeatedly held that, to be convicted of capital offense and sentenced to death, a defendant must have had a particularized intent to kill and the jury must have been charged on the requirement of specific intent to kill. E.g., Gamble v. State, 791 So.2d 409, 444 (Ala. Crim. App. 2000) ; Flowers v. State, 799 So.2d 966, 984 (Ala. Crim. App. 1999) ; Duncan v. State, 827 So.2d 838, 848 (Ala. Crim. App. 1999).'
" Ziegler v. State, 886 So.2d 127, 140 (Ala. Crim. App. 2003)."
Wimbley v. State, 191 So.3d 176, 228 (Ala. Crim. App. 2014), cert. granted, judgment vacated, --- U.S. ----, 136 S. Ct. 2387, 195 L.Ed.2d 760 (2016). "Thus, in a prosecution for capital murder, the State bears the burden of proving beyond a reasonable doubt that the defendant had the specific intent to kill." Townes, 253 So.3d at 458. See also § 13A-5-40(b), Ala. Code 1975; Heard v. State, 999 So.2d 992, 1005 (Ala. 2007) ("[A] defendant must have the intent to kill in order to be found guilty of a capital offense." (citing § 13A-5-40(b), Ala. Code 1975 ) ); Ex parte Woodall, 730 So.2d 652, 657 (Ala. 1998) ("No defendant can be found guilty of a capital offense unless he had an intent to kill." (citing Beck v. State, 396 So.2d 645, 662 (Ala. 1981), and Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) ).
Although a capital-murder conviction requires proof of specific intent to kill, the prosecutor incorrectly told the jury that it could establish the element of intent by showing that Towles "reasonably knew that he was either going to cause [Geontae's] ... death or serious physical injury." (R. 2805)(emphasis added). The prosecutor then erroneously explained to the jury that, "[i]f I do something to you and I know that it's a reasonable likelihood I'm either going to kill you or seriously injure you and you die, that's sufficient evidence of intent." Id. Later, the circuit court solidified the error by instructing the jury that "the severity of a defendant's action may be sufficient proof of knowledge of the probability of death or great bodily harm sufficient to constitute murder." (R. 2870.)
The State concedes that the circuit court's instruction on intent was erroneous but argues that the error was harmless.[3]
*1086 Specifically, the State asserts that "[t]he character of the assault on Geontae was so egregious that there is no probability that the jury could have drawn an inference that Towles only intended to cause great bodily harm." (State's brief, at 17.) According to the State, Towles's use of a weapon on a five-year-old boy to cause significant injuries constitutes overwhelming evidence that Towles intended to kill Geontae; therefore, any error was harmless. This Court disagrees.
The evidence indicates that Towles, a grown man, used a deadly weapon to strike and eventually kill a five-year-old boy. Those facts are sufficient for the jury to infer that Towles intended to kill Geontae. See Clark v. State, 196 So.3d 285, 307 (Ala. Crim. App. 2015) ("It is well settled that intent to kill may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances." (additional citations and quotations omitted) ). Those facts, however, do not lead to the inescapable conclusion that Towles intended to kill Geontae.
The State's evidence indicated that Towles forced Geontae to the backyard of his house to punish him for receiving a straight face on a conduct report. Towles used a piece of lumber to strike Geontae on the buttocks. Geontae did not die during the attack. Instead, Towles carried him back in the house and placed him in a room. Later that evening, Towles took food to Geontae. At some point, Geontae died from the injuries he had received.
Although there was sufficient evidence from which the jury could infer that Towles intended to kill Geontae, the evidence establishing Towles's intent was not so overwhelming as to render the error harmless. Rather, intent was a contested issue, and Towles reasonably urged the jury to find that the crime consisted of a punishment gone too far. The circuit court's instruction, however, allowed the jury to reject that defense. In other words, "[b]ased on the trial court's instructions, the jury could have found [Towles] guilty of capital murder if he intended to [injure Geontae], but did not intend to kill [him]." Brown v. State, 72 So.3d 712, 720 (Ala. Crim. App. 2010). As such, the circuit court's instruction had "an unfair prejudicial impact on the jury's deliberations," Ex parte Bryant, 951 So.2d 724, 727 (Ala. 2002) (citations and quotations omitted), and "adversely affected [Towles's] substantial right[s]." Ex parte Brown, 74 So.3d 1039, 1043 (Ala. 2011). Accordingly, the circuit court's instruction on intent constituted plain error and requires that Towles's conviction and sentence be reversed. See Rule 45A, Ala. R. App. P.
For the foregoing reasons, this Court reverses the circuit court's judgment and remands this cause for proceedings consistent with this opinion.
REVERSED AND REMANDED.
Welch, Kellum, and Joiner, JJ., concur. Burke, J., recuses himself.

"The AMBER Alert Program distributes information regarding children who may have been abducted to the general public through various media." C.L.G. v. State, 50 So.3d 1123, 1125 n.1 (Ala. Crim. App. 2009)

The record is conflicting as to whether Towles said two or three men robbed him.

The erroneous jury instruction resulted from this Court's discussion in Boyle v. State, 154 So.3d 171, 223 (Ala. Crim. App. 2013), of the sufficiency of the State's evidence to establish the intent element of capital murder. While discussing the sufficiency of the State's evidence, this Court stated:
" 'The severity of defendants' actions certainly gave them knowledge of the probability of death or great bodily harm, sufficient to constitute murder. The intent to kill may be inferred by the vicious character of an assault. See People v. Allum, (1967), 78 Ill. App. 2d 462, 223 N.E.2d 187, citing People v. Winters, (1963), 29 Ill.2d 74, 193 N.E.2d 809.' "
Boyle, 154 So.3d at 223 (quoting People v. Carter, 168 Ill. App. 3d 237, 248-49, 118 Ill.Dec. 983, 522 N.E.2d 653, 660 (1988) ). This Court's statement was not intended to imply that the State could establish capital murder without proving that the defendant specifically intended to kill. To the extent this Court's statement in Boyle could be so read, it is overruled.